[No. B019766. Second Dist., Div. Three. Nov. 18, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
NASSIRA MILLER et al., Defendants and Appellants.

308

**COUNSEL**

Joseph E. Gerbac, under appointment by the Court of Appeal, Wilbur Littlefield, Public Defender, Laurence M. Sarnoff, Alan J. Gelfand and

John Hamilton Scott, Deputy Public Defenders, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Marc E. Turchin, Paul C. Ament and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### ARABIAN, J.—

#### STATEMENT OF THE CASE

In an information filed by the District Attorney of Los Angeles County, appellants Nassira Miller and Charles Winston Maxwell were charged with possessing cocaine for the purpose of sale, in violation of Health and Safety Code section 11351.

Appellants were arraigned and pled not guilty. Each appellant filed a motion to suppress evidence pursuant to Penal Code section 1538.5. The court denied the motions.

Appellants subsequently withdrew their pleas of not guilty and entered pleas of guilty to the charged offense. Proceedings were suspended and each appellant was placed on probation for three years on various terms and conditions, including service of 90 days in county jail. Stays of execution were granted.

Timely notices of appeal were filed from the denials of each appellant's section 1538.5 motion.

#### STATEMENT OF FACTS

During the week of January 14, 1985, an unidentified informant told John Cohen, a special agent for Naval Investigative Services, that she had heard that a person known as "Nanu," who lived in Navy housing was selling large quantities of "crystal" to other people living in Navy housing, including dependents. Nanu was described as a woman of Oriental descent, approximately five feet three inches tall. This informant had called Cohen up to fifteen times with information, which led to four or five arrests.

A second informant told Cohen that Nanu's last name was Miller and that she resided in Navy housing in the area of 1960-2 West 19th Street, Long Beach. This informant also provided a telephone number. Upon discovering that this address was incorrect Cohen went through Naval records and found that Miller lived at 1950-2 West 19th Street in Long Beach. Cohen gave this information to members of the Drug Investigation Unit of the Long Beach Police Department, which included Officer Harter and Officer Smith.

On January 16, 1985, around 7 p.m., Officer Harter went to the subject location. He knocked at the door but received no response. As he was leaving he observed appellant Miller exiting a vehicle which was parked in the space assigned to the residence.

Officer Harter approached Miller and inquired if she was Nanu. When she replied " 'Yeah. What do you want?' " Harter stated, " 'I [want] a quarter gram.' " She asked, " 'Who are you?' " Harter indicated he was a friend of Steve Shamanin of the USS DUNCAN. The name had been given to Cohen by one of the informants. Miller replied, " 'Okay. Follow me' " and walked to the front door of the residence. At that time appellant Maxwell stated, " 'Hey, Nanu, what's going on?' " She responded, " 'This guy knows Steve. I'm going to sell him some crystal.' " When appellant Maxwell cautioned, " 'No. Don't deal with him until you talk with Steve,' " appellant Miller told Officer Harter, " 'I'm sorry, you'll have to have Steve or his wife call me. Sorry.' " Harter left the location.

Officer Harter advised Investigator Cohen and members of the drug investigation unit of these occurrences at the Long Beach police station. Cohen attempted to telephone the commanding officer of the Long Beach Naval Station to obtain a permissive command search under rule 315 of the Military Rules of Evidence.[1] The commanding officer was not present; how-

---

[1] Rule 315 (b)(1), defines an "authorization to search" as was sought in this case as follows: "(1) *Authorization to search.* An 'authorization to search' is an express permission, written or oral, issued by competent military authority to search a person or in an area for specified property or evidence or for a specific person and to seize such property, evidence, or person. It may contain an order directing subordinate personnel to conduct a search in a specified manner."

Rule 315 (f) delineates the basis for such a search authorization: "(f) *Basis for search authorizations.*

"(1) *Probable cause requirement.* A search authorization issued under this rule must be based upon probable cause.

"(2) *Probable cause determination.* Probable cause to search exists when there is a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched. A search authorization may be based upon hearsay evidence in whole or in part. A determination of probable cause under this rule shall be based upon any or all of the following:

ever, Investigator Cohen contacted Commander Kalel, who, according to Naval instruction, was the acting commanding officer.

Investigator Cohen gave Commander Kalel all of the information he had received. He told him the first informant had related that she had learned of Nanu's trafficking from friends who had purchased narcotics from Nanu rather than from personal contact. He also stated the second informant had related that she had contact with Nanu within the previous week and Nanu told her of "parties," using terminology which led the second informant to believe that drugs were being used at the "parties." The second informant said Nanu commented she had "business" to attend to this week and the informant said she had the impression from Nanu that the term "business" referred to narcotic trafficking. Investigator Cohen determined that appellant Miller was a dependent wife connected to her husband in the Navy and appellant Maxwell was a sailor assigned to the USS NEW JERSEY. Commander Kalel authorized Investigator Cohen to search the residence.

Investigator Cohen went to the location at approximately 11 p.m. He was accompanied by members of the Long Beach Police Department Drug Investigation Unit, including Long Beach Police Officers Anthony Batts and Joseph Smith. He knocked on the door. There was no answer. He waited approximately three minutes and knocked again. Investigator Cohen then announced, " 'John Cohen, Naval Investigation Services. We have been authorized to search this residence, open the door.' " Appellant Maxwell opened the door. Investigator Cohen identified himself by showing his badge and credentials, told him the officers had authorization to search the house and asked if they could come in. Appellant Maxwell stepped away from the door and the officers entered the house. As he entered he saw appellant Miller sleeping on a couch in the living room.

A search of the residence was conducted. Investigator Cohen went upstairs with Officer Smith to secure the rest of the house because he had reason to believe that appellant Miller's husband was in the house at the time. Officer Batts found cocaine residue in a smoking pipe, an Ohaus weighing scale and a baggie of white material which appeared to be cocaine. Officer Smith examined a quantity of cocaine found approximately two feet in front of appellant Miller on a coffee table. Appellant Miller was advised of her constitutional rights and waived her rights. She told Officer Smith the cocaine was hers and she had a cocaine habit. In order for her to support

"(1) Written statements communicated to the authorizing officer;
"(2) Oral statements communicated to the authorizing official in person, via telephone, or by other appropriate means of communication; or
"(3) Such information as may be known by the authorizing official that would not preclude the officer from acting in an impartial fashion. . . ."

her habit, it was necessary for her to sell the drug. She said she was glad she had finally been caught as it would afford her the opportunity to quit using drugs. Officer Smith was present when appellant Maxwell was arrested. Maxwell stated, " 'Why don't you leave her here. All the drugs are mine.' " When Investigator Cohen came back down the stairs, he was shown a bag of white powder. In Officer Smith's expert opinion the cocaine was possessed for sale.

On January 18, 1985, Zafar Rao, an expert forensic chemist, examined the contents of the box marked People's exhibit No. 1 for identification finding a plastic baggie containing white powder. The weight of the powder was 8.69 grams. He also found an amber colored glass pipe with white residue. He performed a chemical and physical examination and formed the opinion that the powder and residue on the pipe contained cocaine.

According to the memorandum of law introduced as an exhibit by the People, the search took place in the Cabrillo/Savannah Navy Housing Area, which is owned by the federal government. However, the area is *not* subject to federal legislative jurisdiction, and federal citations may not be issued for offenses committed in the area. The Commanding Officer of the Long Beach Naval Station is responsible for the operation of the area, and the Navy provides street, grounds, and building maintenance. The City of Long Beach provides gas, water, electricity, trash pickup, and dog catchers, for which the city is reimbursed by the Navy. The City of Long Beach is also responsible for police and fire services, for which it is not reimbursed by the Navy. There is no restriction on public access to the housing area, and posted signs reflect only that the property is owned by the United States government and solicitation is prohibited.

### APPELLANTS' CONTENTIONS

Appellants contend that: 1. The authorization to search was invalid because it was not supported by an oath or affirmation.

2. The results of the search could not be validly admitted in a state court proceeding.

3. The search was not lawful under the Military Rules of Evidence because authorization to search could not be properly issued for off-base naval housing.

4. The authorization to search was overbroad.

5. The authorization to search was not supported by probable cause.

6. The search was invalid because civil police officers participated in executing the search.

DISCUSSION

We need not address the multiplicity of issues appellants raise in challenging the lawfulness of the search since, as we shall explain, this case may be more expeditiously resolved on a more fundamental ground.

■ The standard of review of a proceeding under Penal Code section 1538.5 accords great deference to the trial court as finder of fact. (*People* v. *Superior Court* (*Keithley*) (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].) However, when, as in this case, the facts are essentially undisputed, the reviewing court may disagree with the conclusion below and must exercise its independent judgment in assessing the reasonableness of the search. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961]; *People* v. *Manning* (1973) 33 Cal.App.3d 586, 602-603 [109 Cal.Rptr. 531].)

■ Whether or not the law enforcement officers in this case had probable cause to search for dormant contraband,[2] we find no basis in the record justifying their warrantless entry into appellant Miller's residence for that purpose. ■ "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshhold may not reasonably be crossed without a warrant." (*Payton* v. *New York* (1980) 445 U.S. 573, 590 [63 L.Ed.2d 639, 653, 100 S.Ct.1371].) " 'Belief, however well-founded, that an article sought is concealed in a dwelling house furnishes no justification for a search of that place without a warrant.' [Citation.] . . . . [¶] [P]ast [United States Supreme Court] decisions make clear that only in 'a few specifically established and well-delineated' situations, [citation], may a warrantless search of a dwelling withstand constitutional scrutiny, even though the authorities have probable cause to conduct it. The burden rests on the State to show the existence of such an exceptional situation. [Citations.]" (*Vale* v. *Louisiana* (1970) 399 U.S. 30, 34 [26 L.Ed.2d 409, 413, 90 S.Ct. 1969]; see also *Lorenzana* v. *Superior Court*

---

[2] Although we have otherwise obviated a full analysis of the probable cause issue, we nevertheless express serious reservation as to whether the articulated facts would pass constitutional muster on this question. The scant and inconclusive information provided by the informants appears at best only to have justified further investigation notwithstanding appellant Miller's subsequent conversation with Officer Harter. (*People* v. *Triggs* (1973) 8 Cal.3d 884, 895 [106 Cal.Rptr. 408, 506 P.2d 232], disapproved on other grounds in *People* v. *Lilienthal* (1978) 22 Cal.3d 891, 896, fn. 4 [150 Cal.Rptr. 910, 587 P.2d 706]; see *People* v. *Fein* (1971) 4 Cal.3d 747, 752-753 [94 Cal.Rptr. 607, 484 P.2d 583]; see also *People* v. *Madden* (1970) 2 Cal.3d 1017, 1020-1024 [88 Cal.Rptr. 171, 471 P.2d 971].)

(1973) 9 Cal.3d 626, 639 [108 Cal.Rptr. 585, 511 P.2d 33]; *People* v. *Marshall* (1968) 69 Cal.2d 51, 57 [69 Cal.Rptr. 585, 442 P.2d 665].)

The only recognized exceptions permitting a warrantless search of a dwelling are exigent circumstances and consent. (*Steagald* v. *United States* (1981) 451 U.S. 204, 211-212 [68 L.Ed.2d 38, 45, 101 S.Ct. 1645]; see also *People* v. *Ramey* (1976) 16 Cal.3d 263, 270-274 [127 Cal.Rptr. 629, 545 P.2d 1333], cert. den. *sub nom. California* v. *Ramey,* 429 U.S. 929 [50 L.Ed.2d 299, 97 S.Ct. 335].) The prosecution made no attempt to justify the instant search on the basis of exigent circumstances, and none appear of record. Nor does the record support any inference of a valid consent to enter. Appellant Maxwell opened the door and admitted the officers in response to Investigator Cohen's announcement, " 'We have been authorized to search this residence, open the door.' " ■ "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." (*Bumper* v. *North Carolina* (1968) 391 U.S. 543, 550 [20 L.Ed.2d 797, 803, 88 S.Ct. 1788].)

■ For several reasons, the search is also not supported on the theory that the command authorization for search and seizure confirmed by Commander Kalel constituted the equivalent of a search warrant. The Attorney General focuses his arguments on appeal almost exclusively on validating the search as a proper exercise of military authority over military personnel on military property. However, it appears from the record that the Cabrillo/Savannah Navy Housing Area,[3] in which the search took place, does not fall within the scope of a military search authorization.[4] More importantly,

---

[3] A memorandum of law explaining the status of the Cabrillo/Savannah Naval Housing Area and details of its daily operation was introduced by the prosecution as an exhibit in conjunction with the motion to suppress. That exhibit is not included in the record on appeal; however, respondent has not challenged the previously set forth summary of the substance of that exhibit taken from appellant Maxwell's opening brief. Nor did the prosecution contradict a similar characterization of the area by trial counsel for appellant Miller. Therefore, we accept these as the operative facts of this case. (See *Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944, 951 [153 Cal.Rptr. 720].)

[4] Rule 315 (c) of the Military Rules of Evidence specifies the scope of a search authorization as follows: "(c) *Scope of authorization.* A search authorization may be issued under this rule for a search of:

"(1) *Persons.* The person of anyone subject to military law or the law of war wherever found;

"(2) *Military property.* Military property of the United States or of nonappropriated fund activities of an armed force of the United States wherever located;

"(3) *Persons and property within military control. Persons or property situated on or in a military installation, encampment,* vessel, aircraft, vehicle, *or any other location under military control,* wherever located; or

"(4) *Nonmilitary property within a foreign country.*

the search in this case was fully participated in by civilian law enforcement; and the appellants were charged as civilians by civilian authority with violation of civilian law.

Under such circumstances, any prerogative the military authority may have had to prosecute its own laws cannot justify an invasion of the appellants' constitutional rights in state court. The rationale for this conclusion was explained by the California Supreme Court two decades ago: " 'The doctrine exalting military efficiency above individual liberty is rooted in cases considering habeas corpus petitions that sought the petitioner's release from confinement imposed by courts-martial. The present case is distinguishable. The person whose rights were allegedly invaded is a military man. The conduct complained of is that of military authorities and an FBI agent summoned by the military. But here the military authorities have chosen to invoke the criminal jurisdiction of the civilian courts. Thus the case is altogether different from those in which military courts are meting out military justice to military personnel.

" 'The argument that the Fourth and Fifth Amendments have no application to the search and interrogation here conducted must be rejected. It represents an attempt to extend the sphere of military justice and seeks to make civilian authority the handmaiden of military discipline. If a member of the Armed Forces stands accused before a civilian tribunal, he is protected with his full constitutional armor. His posture is no different from that of any other defendant so far as protection of the Constitution is concerned. His military status cannot shear him of his basic rights.' " (*People* v. *Kelley* (1967) 66 Cal.2d 232, 251 [57 Cal.Rptr. 363, 424 P.2d 947], quoting *United States* v. *Miller* (D.Del. 1966) 261 F.Supp. 442, 445, 446.)

Even if the command authorization were the equivalent of a search warrant, the one used in this case clearly would not meet constitutional standards. At the very least, it is not supported by an oath or affirmation as required by the Fourth Amendment. Nor did the authority to search com-

---

"(A) Property owned, used, occupied by, or in the possession of an agency of the United States other than the Department of Defense when situated in a foreign country. A search of such property may not be conducted without the concurrence of an appropriate representative of the agency concerned. Failure to obtain such concurrence, however, does not render a search unlawful within the meaning of Mil. R. Evid. 311.

"(B) Other property situated in a foreign country. If the United States is a party to a treaty or agreement that governs a search in a foreign country, the search shall be conducted in accordance with the treaty or agreement. If there is no treaty or agreement, concurrence should be obtained from an appropriate representative of the foreign country with respect to a search under paragraph (4)(B) of this subdivision. Failure to obtain such concurrence or noncompliance with a treaty or agreement, however, does not render a search unlawful within the meaning of Mil. R. Evid. 311." (Italics added.)

port with the constitutional requirement of specificity.[5] (See, e.g., *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 249 [118 Cal.Rptr. 166, 529 P.2d 590].) And, we have already expressed our reservations as to whether the information available to the officers established probable cause to search.[6] (See fn. 2, *supra*.)

Since state law enforcement officers were clearly integral to the instigation and execution of the search in this case, the constitutional deficiencies in the command authorization as a search warrant preclude us from upholding the validity of their efforts.[7] We cannot condone such a violation of rights under some version of the now largely discarded "silver platter" doctrine. (*People* v. *Mattson* (1984) 37 Cal.3d 85, 92-93 [207 Cal.Rptr. 278, 688 P.2d 887]; *People* v. *Kelley, supra,* 66 Cal.2d at pp. 249-251; *People* v. *Helfend* (1969) 1 Cal.App.3d 873, 889 [82 Cal.Rptr. 295], cert. den. *sub nom. Helfend* v. *California* (1970) 398 U.S. 967 [26 L.Ed.2d 551, 90 S.Ct. 2182].)

CONCLUSION

A military raid into enemy territory, authorized by a commander, has victory as its objective.

Unfortunately, the victory described here, occasioned by a raid into the streets of the city, was but a hollow one.

Our review of pertinent authority discloses the presence of command confusion regarding proper procedures to be used in the penetration of areas outside the immediate military reservation. Here, under circumstances where governmental, military and civilian interests overlap or are commingled, the trinity of prudence and the state and federal Constitutions mandates the involvement of a neutral and detached magistrate whose

---

[5] The scope and specificity of the search authorization were testified to by Investigator Cohen in the following terms: "The Executive Officer [Kalel] authorized me to search the residence."

We further observe that as the search occurred at approximately 11 p.m., the authorization was deficient in its failure to comport with the requirements of Penal Code section 1533. That statute requires service of a search warrant "between the hours of 7 a.m. and 10 p.m." unless it includes an express directive from the issuing magistrate that "it may be served at any time of the day or night."

[6] Although we do not pass on the question, we also have considerable doubt as to whether a military court would find the facts sufficient to establish probable cause. (See, e.g., *United States* v. *Scarborough* (1974) 23 C.M.A. 51, 53-54; *United States* v. *Battista* (1963) 14 C.M.A. 70, 72-73; *United States* v. *Brown* (1959) 10 C.M.A. 482, 488-489.)

[7] In light of the obvious facial invalidity of the command authorization as a search warrant equivalent, we also cannot uphold the search under the good faith exception of *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405].

judicial compass may or may not allow the piercing entry of a search warrant.

Unrestrained and errant tactics by men of zeal which circumvent the most basic legal protections are not only fruitless, but even worse, are not consistent with the high ideals of military service.

### DISPOSITION

The judgments of conviction are reversed.

Klein, P. J., and Danielson, J., concurred.

A petition for a rehearing was denied December 17, 1987, and respondent's petition for review by the Supreme Court was denied February 25, 1988.