Filed 11/30/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOHN DAVID NEAL,<br><br>        Defendant and Appellant. | A153101<br><br>(Contra Costa County<br>Super. Ct. No. 5-161613-5) |

Appellant John David Neal (appellant) appeals from a judgment convicting him of possession of a firearm by an ex-felon (Pen. Code, § 29800, subd. (a)(1)),[1] claiming evidence regarding firearms taken from his home by the police should have been suppressed as the fruit of an unconstitutional warrantless search. Appellant also contends that the probation supervision fee he was ordered to pay was improperly imposed by the trial court without any determination of his ability to pay it.

We shall reject the first claim but find that the second is meritorious.

## THE FACTS

After the jury was selected, trial was completed in a single day. Antioch Police Officer Randall Gragg was the sole witness for the People and appellant the sole defense witness.

Officer Gragg testified that on the evening of December 22, 2014, he and his field training officer, Corporal Shawn Morin, were informed by radio that a man at the

_____

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.

[1] All further statutory references are to the Penal Code unless otherwise specified.

1

Antioch Marina was acting in a possibly suicidal manner. When they arrived at the marina, Officer Gragg observed appellant talking to Antioch Police Sergeant Schnitzius. Appellant told Schnitzius he was previously in the military and had been a police officer and possessed police and military weapons at his home in Antioch. Because appellant appeared upset and fluctuated between moments of calmness and frustration, he was transported to a hospital to be psychologically evaluated.[2]

Officers Gragg and Morin then went to appellant's residence to learn whether it contained the weapons appellant mentioned to the police. They arrived and were met by appellant's wife, Mimi Neal (Neal). Officer Gragg asked her whether she was aware of any firearms in the house. She told them she was and "said something to the effect of, yes, I don't want these guns in my house." Neal led the two officers to the master bedroom and asked them to look into a walk-in closet where they found six firearms: "four long guns, two rifles and two shotguns." The officers collected the firearms for safekeeping and provided Neal a property receipt.

When the officers returned to the police department, Officer Gragg conducted a check of appellant's criminal history and found he had a prior felony conviction for assault in 2006. Concluding appellant was a convicted felon in possession of firearms, Gragg contacted "evidence personnel" and advised them that the firearms taken from appellant's home were now being used for "evidentiary purposes," not for safekeeping.

Later, Officer Morin received a voicemail on a police department phone from appellant sarcastically thanking him for taking his firearms and inquiring about how he could get them back. Appellant stated that the guns belonged to him and he intended to give them as Christmas presents to his children. Officer Morin recorded the voicemail, and it was played for the jury.

Appellant testified that he went to the Antioch Marina to clear his head of concerns about family matters. Shortly after he arrived, he was approached by a police

_____

[2] The parties agreed that the evaluation was to determine whether appellant should be held pursuant to section 5150 of the Welfare and Institutions Code.

officer (Sergeant Schnitzius) who asked his name and what he was doing at the pier. He spoke freely to the officer because he had nothing to hide, and told him that his father had recently died and this was the first Christmas he had spent without his father. He also stated that he just received the bulk of his father's estate and this "was just bringing up a lot of memories." When the officer asked whether he possessed a weapon or there was one in his vehicle appellant answered "no" but added that he did have weapons at home that were "part of the probate estate that had been delivered to the house after the courts had settled what they called a disposition of possession of property."

On December 23, the day after he spoke with police officers at the Marina, appellant went to the Antioch Police Department, "[p]artly to see what I needed to do next when I found out that morning that the guns had been removed from the house. Partly to vent some frustration on the following events after they were [re]moved." Appellant testified that he "was trying to retrieve my father's property to be given to family members that were coming from both out of state and out of the area to meet up for the holidays." Appellant admitted that he had not provided the information about giving the guns to other family members in the voicemail he left for Officer Morin, but he stated that he had given this information to Officer Pfeiffer, another Antioch police officer.

On cross-examination appellant admitted his prior felony conviction and the authenticity of the plea form he executed that was the basis of that conviction. However, he testified that when he signed the plea form he understood that the specific rights he lost while on probation, including the prohibition of the possession of firearms, would be returned to him following his successful completion of probation, as was his right to vote.

The jury convicted appellant of the sole charge of possession of a firearm by an ex-felon, and the court suspended imposition of sentence and placed appellant on probation for three years.

The report and recommendation of the probation officer recommended that appellant be placed on probation and, among other things, also recommended that appellant pay for the cost of probation supervision as determined by the probation officer

3

but not to exceed $75 per month. The report contains no analysis of appellant's financial ability to pay that amount.

## I.

### *Appellant's Motion to Suppress Was Properly Denied*

Appellant's pretrial motion to suppress evidence of firearm possession (§ 1538.5) was heard on May 5, 2017.

Prior to the testimony of Officer Gragg, who was also the sole witness for the People at the suppression hearing, the trial court established that since appellant was not seeking to suppress evidence obtained during the process of his detention, but only evidence later obtained from his home, the circumstances of the detention were irrelevant; the only issue being whether appellant's wife consented to the warrantless search and seizure. Counsel for the parties agreed that was the case.

Officer Gragg's brief testimony commenced with the district attorney's request that he describe the conversation he had with appellant's wife when he went to appellant's home with Officer Morin.

"A. The nature of the conversation was regarding [appellant] being placed on a hold pursuant to Welfare and Institutions Code [section] 5150. [3]

"Q. And did part of your conversation with Neal [appellant's wife] involve firearms?

"A. It did.

"Q. And can you describe that part of the conversation?

"A. I explained to Neal the procedure of confiscating firearms for safekeeping for subjects that have been placed on a 5150 hold.

"Q. And how did she respond to that?

"A. Neal was very cooperative and she seemed almost eager to get the firearms out of her house.

---

[3] Appellant was never held pursuant to Welfare and Institutions Code section 5150 because the doctor who evaluated him when he was brought to the hospital by the police concluded that appellant did not meet the criteria for such a hold.

4

"Q. So that when you initially told her that you were there to confiscate any firearms, what did she say?

"A. She said something to the effect of I don't want them in my house. Please take them out of my house.

"Q. And what happened after that?

"A. Mimi Neal allowed us into her house and led us to the master bedroom, I guess you call it walk-in closet, and she showed us to where the firearms were stored.

"Q. And where were the firearms stored in the closet?

"A. The closet was segregated by what appeared to be female clothing on the left, male clothing on the right and all the firearms were on the male side of the closet.

"Q. All right. And when you say that she showed the firearms to you, did she just show you to the closet or did she point to where the firearms were?

"A. Just showed me to the closet.

"Q. After you located the firearms, did Neal say anything?

"A. I don't recall.

"Q. Did she ask you to take the firearms away?

"A. She did. She repeated that several times throughout the contact."

On cross-examination Officer Gragg added that he was accompanied by Officer Morin, they appeared at appellant's house about 8:00 p.m., when it was dark, they were wearing police uniforms, Gragg possessed a firearm and a taser, and Neal was then alone in the house with her children.

After the testimony ended, defense counsel agreed with the court that the issue was whether Neal's consent was voluntary and argued that "compliance with an assertion of police authority does not constitute voluntary consent and giving directions or orders usually vitiates consent. So there's a difference between coming to a house and saying, [m]ay I come in[] and [m]ay I perform a search? [Or, can] I have your permission? [A]nd just saying I'm here to search your house and someone getting out your way and allowing their home to be searched." "[W]hat we have," defense counsel argued, "is a woman being told that her husband is at the hospital, she's home alone with her kids at

5

night, two uniformed police officers come to her door, tell her they have a right to investigate, look for and seize guns and she gets out of the way and says, please do that. I don't think that is the same as giving voluntary consent. That is a respectful person responding to a show of authority, and compliance to that assertion of police authority is not the same as voluntary consent."

The court was not persuaded. As it stated, "I did not hear what you think you heard because I certainly did not hear this officer testify that he told Neal that they were there to search the house and that they had the right to search the house or that they were going to search the house. That's not what he said. What he said was that in light of the 5150 arrest, they were there to investigate whether or not [appellant] possessed any firearms and [appellant's wife] affirmed that he did and invited them in to take them. But they never said we have a right to search this house or we're going to search this house or anything along those lines." Accordingly, appellant's motion to suppress was denied.

The ruling was justified.

Our review of a trial court ruling on a motion to suppress is governed by settled principles. In ruling on such a motion " 'the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] "The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review." [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, . . . is also subject to independent review.' [Citation.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 182, quoting *People v. Williams* (1988) 45 Cal.3d 1268, 1301.)

Appellant's reply brief focuses on the Attorney General's contention that the trial court's factual determination that appellant's wife consented to the search based on her own desire to get rid of the guns, not because she felt legally compelled to do so, is amply

6

supported by substantial evidence. Appellant emphasizes that "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness" (*Florida v. Jimeno* (1991) 500 U.S. 248, 251), and argues that the Attorney General improperly relies on appellant's wife's *subjective* desire to get rid of appellant's firearms. We do not see it that way.

The trial court placed greatest weight on the conduct of the police officers, particularly Officer Gragg, not on Neal's attitude about firearms. For that reason, this case is analogous to *People v. Munoz* (1972) 24 Cal.App.3d 900, the case the Attorney General primarily relies upon, which appellant ignores. In *Munoz* four officers went to an apartment in a building in which they were told the defendant possessed and was selling drugs. One officer knocked on the screen door, identified himself and announced that he was investigating possible narcotics sales. After several minutes delay, the defendant invited the officers in and, after some hesitation, on learning that the officers desired to make a warrantless search, said " 'Yeah, go ahead and search.' " As part of their search the officers entered a bedroom apparently in the possession of a tenant or guest of the defendant without the consent of that possessor. Reversing a ruling that the search was invalid, the Court of Appeal pointed out that the officers did not suddenly materialize, nor did they surprise Munoz or others in the apartment. "Munoz knew who they were when he invited them into his home. . . . There was . . . no assertion of a right to enter or search" and "no evidence of 'confrontation' in the sense of challenge or resistance or . . . threat or hostility, and no evidence from which a rational inference could be drawn that there was any compulsion of the type that would render the consent constitutionally inadequate." (*Id.* at p. 905.) The same can be said of the encounter between Officers Gragg and Morin and Neal.

The facts of this case are materially different from those of the two cases appellant primarily relies upon—*People v. Miller* (1978) 196 Cal.App.3d 307 and *Phillips v. County of Orange* (S.D.N.Y. 2012) 894 F.Supp.2d 345—because in both the police demanded entry on the basis of unjustified assertions of legal authority. Officer Gragg told Neal her husband had been placed on a section 5150 hold, but he never suggested

that section 5150, or any other statute or authority, empowered him or Officer Morin to enter or conduct a search of her home. *People v. Bailey* (1985) 176 Cal.App.3d 402, which appellant also relies upon, is also easily distinguishable. In that case the Court of Appeal affirmed the granting of a motion to suppress because the search was coerced by the overt physical assertion of police authority far beyond any representation made by the police in this case.

The trial court did not err in denying appellant's motion to suppress.

## II.

### *The Court Erred in Imposing the Probation Supervision Fee Without First Determining His Ability to Pay*

At the close of the sentencing hearing, defense counsel objected to the recommendation in the probation officer's sentencing report that appellant "pay for the cost of probation services as determined by the probation officer, not to exceed $75 per month." Defense counsel noted that appellant "is on disability. His wife is the only one who works outside the home. They support two children together and their income with their family obligations makes it so that they're in danger at this point of having their house foreclosed upon."[4] The court responded that "[t]he probation officer is the one who makes the determination. What they're asking for is that [appellant] pay for the cost of probation services as determined by the probation officer not to exceed $75 per month. So the probation officer's going to do an ability to pay analysis and *that's a decision to*

---

[4] Inexplicably, defense counsel did not also object to the recommendation in the probation officer's report that appellant "pay a probation report fee of $176 pursuant to section 1203.1b," which the court ordered appellant to pay. As will be seen, section 1203.1b, subdivision (a), requires the probation officer to " 'make a determination of the ability of the defendant to pay all or a portion of the reasonable cost of any probation supervision . . . and preparing any . . . presentence report made pursuant to Section 1203.' " (*People v. Valtakis* (2003) 105 Cal.App.4th 1066, 1070-1071, fn. 2.) For reasons set forth in *Valtakis* at pages 1073-1075, and because appellant challenged imposition of the probation report fee for the first time at oral argument, we conclude that appellant has waived this claim on appeal. (See *People v. Trujillo* (2015) 60 Cal.4th 850, 860, citing *Valtakis* with approval.)

*be left to probation.* That's not for the court to decide at this point." (Italics added.) As stated by the court, "somebody has to make the [probation services fee] determination, and the court doesn't have the information."

Defense counsel then objected to the probation officer making the fee determination on the ground that appellant had completed a financial assessment form at the time he was arraigned to establish that he qualified for free representation by the Public Defender's Office, and his financial situation had not improved but worsened since then due to increasing medical expenses. The court responded, "I don't think you understand my position. It's not that I disagree with that because I don't. It's that it's not the court's determination. It's probation's. I'm going to defer to probation to make the right decision . . . . [¶] I'm not going to weigh in to [appellant's] financials."

Section 1203.1b, subdivision (a), provides that where, as here, a defendant is convicted of an offense and is the subject of any preplea or presentence report, "the probation officer, or his or her authorized representative, taking into account any amount that the defendant is ordered to pay in fines, assessments, and restitution, shall make a determination of the ability of the defendant to pay all or a portion of the reasonable cost of any probation supervision," and "shall determine the amount of payment and the manner in which the payments [of a probation supervision fee] shall be made to the county, based upon the defendant's ability to pay." Further, "[t]he probation officer shall inform the defendant that the defendant is entitled to a hearing, that includes the right to counsel, in which the court shall make the determination of the defendant's ability to pay and the payment amount. The defendant must waive the right to a determination by the court of his or her ability to pay and the payment amount by a knowing and intelligent waiver." (§ 1203.1b, subd. (a).) Where the defendant does not waive the right to a judicial determination, the probation officer "shall refer the matter to the court for the scheduling of a hearing to determine the amount of payment and the manner in which the payments shall be made" and at that time "[t]he court shall order the defendant to pay the reasonable costs if it determines that the defendant has the ability to pay those costs based

9

on the reports of the probation officer, or his or her authorized representative." (§ 1203.1b, subd. (b).)

It appears from the record that none of these statutory requirements were met in this case.[5] Appellant was not, either prior to or at the sentencing hearing, informed by the probation officer or the court of any of the rights given him under section 1203.1b; and the court's statements suggest it may have been unaware appellant possessed those rights. Because the probation officer had not determined appellant's ability to pay a probation supervision fee or the manner in which payment of any such fee should be made, the sentencing court was unable to assess those determinations.

Nor did the court provide any indication it was reserving decision on the imposition of a probation services fee, as the Attorney General argues. On the contrary, the court accepted the probation officer's recommendation that *the probation department itself* prescribe a fee not to exceed $75 per month,[6] explicitly stating that it was "going to

---

[5] Additionally, neither the probation officer nor the court advised appellant as required by subdivision (f) of section 1203.1b, which provides: "At any time during the pendency of the judgment rendered according to the terms of this section, a defendant against whom a judgment has been made may petition the probation officer for a review of the defendant's financial ability to pay or the rendering court to modify or vacate its previous judgment on the grounds of a change of circumstances with regard to the defendant's ability to pay the judgment. *The probation officer and the court shall advise the defendant of this right at the time of rendering of the terms of probation or the judgment.*" (§ 1203.1b, subd. (f), italics added.)

[6] It is worth noting, as others have, the problematical nature of such a recommendation due to the probation department's self-interest in a defendant's ability to pay and the amount of the fee payment. All sums paid by a defendant pursuant to section 1203.1b "shall be allocated for the operating expenses of the county probation department." (§ 1203.1b, subd. (g).) However, a county board of supervisors may authorize installment payments of a probation supervision fee to the probation department only if the monthly fee "shall not exceed seventy-five dollars ($75)." (*Id.*, subd. (h).) These provisions suggest that an underbudgeted probation department may have an economic incentive to find defendants able to pay the maximum allowable monthly fee, or at least to resolve doubts about a defendant's ability to pay in favor of the imposition of a fee. As one study has observed, reliance of an aspect of the criminal justice system (such as the probation process) on judicially imposed administrative fees can "threaten the impartiality of judges and other court personnel with institutional,

10

defer to probation to make the right decision." The Felony Order of Probation/Supervision issued by the court told appellant: "Although not a condition of Probation, you are ordered to pay the following fees: . . . Probation Services as determined by Probation."

Where, as in this case, a statute posits ability to pay as a precondition of a requirement to pay a fee comparable to the one at issue here—such as the booking fee authorized by Government Code section 29550.2, subdivision (a)—the defendant has the right to a determination of his ability to pay the fee before the court may order payment. (*People v. McCullough* (2013) 56 Cal.4th 589, 593.) In this situation, unless waived by the defendant, it is for the court, not the probation officer, to make the final determination. Here, neither the court's order nor anything else that took place at the sentencing hearing informed appellant of his right to an adjudication after an evidentiary hearing as to the propriety of the probation officer's determinations, or indicated that those determinations would be subject to any further judicial review. Matters required by the statute to be decided by the court, in the absence of a knowing and intelligent waiver by appellant, were instead left entirely in the hands of the probation officer.

This case is materially indistinguishable from *People v. Pacheco* (2010) 187 Cal.App.4th 1392, disapproved on other grounds by *People v. Trujillo*, *supra*, 60 Cal.4th at page 858, which appellant primarily relies upon and the Attorney General simply ignores. The Court of Appeal concluded that "the statutory procedure provided at section 1203.1b for a determination of Pacheco's ability to pay probation related costs was not followed," pointing out that "[t]here is no evidence in the record that anyone, whether the probation officer or the court, made a determination of Pacheco's ability to pay the $64 per month probation supervision fee. Nor is there any evidence that probation advised

pecuniary incentives." (Bannon et al., Criminal Justice Debt: A Barrier to Reentry (2010) p. 30 (Criminal Justice Debt) <https://www.brennancenter.org/publication/ criminal-justice-debt-barrier-reentry> [as of Nov. 30, 2018].) The political pressures on counties to raise funds from defendants to support the costs of criminal justice processing is also discussed in Harris, A Pound of Flesh: Monetary Sanctions as Punishment for the Poor, Russel Sage Foundation (2016) pp. 110-115 (A Pound of Flesh).)

him of his right to have the court make this determination or that he waived this right." (*Pacheco*, at p. 1401.) Similarly, in *People v. O'Connell* (2003) 107 Cal.App.4th 1062, 1065, the trial court ordered the defendant "to pay the reasonable costs of probation supervision." The Court of Appeal found there was "no indication that the probation department or the court made a determination of appellant's ability to pay for formal probation supervision, or that appellant was ever informed by anyone of his right to a court hearing on his ability to pay, or that appellant knowingly and intelligently waived such a hearing, as required by . . . section 1203.1b. [Citation.]" (*O'Connell*, at pp. 1067-1068.) The court remanded the matter "to allow the trial court to take a knowing and intelligent waiver of a hearing from defendant or to conduct a hearing as provided in . . . section 1203.1b." (*Id.* at p. 1068.)

Strict compliance with the statutorily prescribed process is warranted by the problems that may result from unjustified imposition of probation services fees. As legislative and other policymakers are becoming increasingly aware, the growing use of such fees and similar forms of criminal justice debt creates a significant barrier for individuals seeking to rebuild their lives after a criminal conviction. Criminal justice debt and associated collection practices can damage credit, interfere with a defendant's commitments, such as child support obligations, restrict employment opportunities and otherwise impede reentry and rehabilitation. "What at first glance appears to be easy money for the state can carry significant hidden costs—both human and financial—for individuals, for the government, and for the community at large. . . . [¶] Debt-related mandatory court appearances and probation and parole conditions leave debtors vulnerable for violations that result in a new form of debtor's prison. . . . Aggressive collection tactics can disrupt employment, make it difficult to meet other obligations such as child support, and lead to financial insecurity—all of which can lead to recidivism." (Bannon et al., Criminal Justice Debt, *supra,* p. 5; see also, Harris, A Pound of Flesh, *supra*, pp. 52-52.) As observed in a recent study regarding administrative fees in juvenile proceedings in California, "Fee debt becomes a civil judgment upon assessment. If families do not pay their fees, counties refer the debt to the state Franchise Tax Board,

12

which garnishes parents' wages and intercepts their tax refunds. Under state law, these fees are meant to help protect the fiscal integrity of counties. They are not supposed to be retributive (to punish the family), rehabilitative (to help the youth) or restorative (to repay victims)." (Selbin et al., *Making Families Pay: The Harmful, Unlawful and Costly Practice of Charging Juvenile Administrative Fees in California,* Berkeley Law & Pol'y Advocacy Clinic (Mar. 2017), p. 1; excerpted in Resnik, VanCleave & Bell, eds., *Who Pays? Fines, Fees, Bail, and the Cost of Courts*, Arthur Liman Center for Public Interest Law (2018) (The California Study).) The California Study also points out that "[b]ecause Black and Latino youth are overrepresented and overpunished . . . in the juvenile system, families of color bear a disproportionate burden of the fees" and the inordinate debt these families incur "correlates with a greater likelihood of recidivism, even after controlling for case characteristics and youth demographics." [7] (*Id*. at p. II-27.)

Finally, there is reason to believe administrative fees of the sort authorized by section 1203.1b do not serve their ostensible purpose, to defray the cost of county government. The Office of the Treasurer and Tax Collector of the City and County of San Francisco recently concluded that of all of the fees imposed by the San Francisco Superior Court in behalf of the county, "probation fees [authorized by section 1203.1b] are among the most expensive for individuals, second only to victim restitution, and

---

[7] Shortly after this study was published the Legislature enacted and the Governor signed Senate Bill No. 190 which repealed statutes authorizing the assessment of administrative fees in juvenile delinquency cases, such as those related to the costs of detention, legal representation, electric monitoring, probation or home supervision, and drug testing. (Welf & Inst. Code, §§ 903, 903.1, 903.15, 903.2 & 729.9.) Although the new law does not apply to offenders over the age of 21 and under the jurisdiction of the criminal court, enactment of this measure suggests our Legislature may be reconsidering the assertedly " 'strong legislative policy in favor of shifting the costs stemming from criminal acts back to the convicted defendant' and ' " 'replenishing a county treasury from the pockets of those who have directly benefitted from county expenditures.' " ' " (*People v. Valtakis, supra*, 105 Cal.App.4th at p. 1073, quoting *People v. Phillips* (1994) 25 Cal.App.4th 62, 69.)

13

result in the most long-term debt of the administrative fees . . . examined.[8]  A total of $15.8 million in probation fees has been assessed in the last six years, [of which] $12 million is still uncollected."  (Office of the Treasurer & Tax Collector City and County of San Francisco, The Financial Justice Project, *Criminal Justice Administrative Fees: High Pain for People, Low Gain for Government, a Call to Action for California Counties* (2018) p. 3.)  (Executive Summary).[9]

## III.

The portion of the order of probation requiring appellant to pay for the cost of probation services as determined by the probation officer, not to exceed $75 per month, is set aside.  The case is remanded to the superior court for a determination of appellant's ability to pay all or a portion of the reasonable costs of probation supervision, the amount, if any, of such costs he shall be ordered to pay, and the terms of payment, in accordance with the provisions of section 1203.1b, and the principles articulated in this opinion.

In all other respects, the judgment is affirmed.

_____

_____

[8] A monthly probation supervision fee of $75 during a three-year probation period totals $2,700.

[9] This study, which discusses criminal justice fee collection practices in other counties, found that they "sometimes spend more to collect fees than they bring in" and the fees are therefore "not an effective, reliable, sustainable source of revenue for government or the courts."  (Executive Summary, *supra*, p. 3.)  The California Study also found that "[b]ecause of the high costs and low returns associated with trying to collect fees from low-income families, most of the revenue pays for collection activities, not for the care and supervision of youth."  (Resnik et al., The California Study, *supra*, p. II-27.)  It is instructive that the form Felony Order of Probation/Supervision issued by the court in this case directs defendants to make restitution and fee payments neither to the court or a county agency, but instead "to the Court's collection agency, AllianceOne," which describes itself as "one of the leading accounts receivable providers" worldwide.  (<http//www.allianceoneinc.com/Welcome/all> [as of Nov. 30, 2018 ].)

Kline, P.J.

We concur:

_____
Richman, J.


_____
Stewart, J.

*People v. Neal* (A153101)

| | |
|---|---|
| Trial Judge: | Hon. Bruce C. Mills |
| Trial Court: | Contra Costa County Superior Court |
| Attorney for Appellant: | Under Appointment by the Court of Appeal<br>David A. Kaiser |
| Attorneys for Respondent: | Attorney General of California<br>Xavier Becerra |
| | Gerald A. Engler<br>Chief Assistant Attorney General |
| | Jeffrey M. Laurence<br>Senior Assistant Attorney General |
| | Donna M. Provenzano<br>Supervising Deputy Attorney General |
| | Amit Kurlekar<br>Deputy Attorney General |